# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    **Plaintiff,**

v.                                                                                                    No. CR 18-1243 RB

ROBERTO TREJO,

    **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion to Exclude Expert Testimony of Lester Roane (Doc. 37) and Motion to Exclude Expert Testimony of Special Agent Dennis King (Doc. 38), both filed on August 17, 2018. The Court held a hearing in this matter on September 25, 2018. (*See* Doc. 76.)

Mr. Roberto Trejo (Defendant) is charged with two counts of being a felon in possession of a firearm. To date, the United States has not produced the firearms charged in the counts. Two experts are slated to offer opinions relevant to the missing firearms. Defendant argues that neither expert is qualified to render a reliable opinion because they have not examined the firearms at issue. There is evidence, however, that witnesses have given descriptions of the firearms sufficient for the experts to offer opinions that will shed light on facts in issue. Accordingly, the Court will **deny** Defendant's motions.

**I.    Factual Background**[1]

Defendant is charged in Counts 1 and 2 of the Superseding Indictment with being a felon in possession of a firearm, and in Count 3 with being a felon in possession of ammunition, all in

---

[1] The Court recites only those facts relevant to the motions at issue.

1

violation of 18 U.S.C. § 922(g)(1). (*See* Doc. 24.) To date, the United States has not produced the three firearms related to Counts 1 and 2. (*See* Doc. 38 at 1.) The charges stem from the following incidents:

### A. Count 1

On the morning of May 6, 2016, Defendant took his girlfriend, Ms. Teresa Palacios,[2] to Mountain View Medical Center in Las Cruces. (Doc. 47 at 2.) Hospital staff treated Ms. Palacios for a gunshot wound to the back of her ankle and reported the shooting to the Doña Ana Sheriff's Office (DASO). (*See id.*; *see also* Doc. 48 at 1.)

DASO Deputy Megan Dow arrived at the hospital to interview Defendant and Ms. Palacios around 7:45 a.m. (Doc. 47 at 2.) Deputy Dow accompanied Defendant to his Crown Victoria automobile to retrieve his identification, then the two returned to the hospital room to continue talking. (*Id.*) While Ms. Palacios did not know what type of gun caused her injury, "Defendant described the firearm as a black and gray 9 millimeter semiautomatic pistol." (*Id.*) Defendant also "acknowledged that he is not allowed to possess firearms as a convicted felon." (*Id.*) At some point, Deputy Dow stepped out of the room to make a phone call. (*Id.*) When she returned, she discovered that Defendant had left the hospital. (*Id.*) Deputy Dow then drove to Ms. Palacios's mother's house—where Ms. Palacios had sustained the gunshot wound—and saw Defendant's Crown Victoria parked at the house. (*Id.*) She knocked on the door and left when no one answered. (*Id.*)

"ATF agents interviewed Defendant on May 11, 2016." (*Id.*) Defendant told the agents that he was in the kitchen and Ms. Palacios was in the bedroom on the morning of May 6, 2016, when he heard Ms. Palacios say, "hey babe, come and check this out." (*Id.* at 2–3.) He heard

---

[2] Though not addressed in the pleadings, both parties agreed orally during the September 25, 2018 motion hearing in this matter to refer to Ms. Palacios by her name, rather than as Jane Doe.

something hit the floor and then heard a gunshot, and when he entered the bedroom, Ms. Palacios was on the floor with a gunshot wound. (*Id.* at 3.) Defendant told the agents that he took Ms. Palacios to the hospital and did not do anything with the gun. (*Id.*) There was no one else home when the two left, and he did not tell anyone about the gun. (*Id.*) After Defendant left the hospital on the morning of May 6, 2016, he stopped by the house to drop off his car before going to work. (*Id.*) When he returned home from work, the door to the house was open and the gun was missing. (*Id.*)

Ms. Palacios has described several different versions of the shooting. During her first interview with DASO, at the hospital in a joint interview with Defendant, she "stated that she had been moving some clothes around a dresser when a gun accidentally fell and shot her." (Doc. 46 at 2.) Later, she informed staff at the hospital several times that "she accidentally shot herself." (*See id.*) During a subsequent interview, Ms. Palacios told ATF agents that the night before her injury she had been fighting with Defendant, and in the morning when she demanded he leave her house, she turned her back to him and then felt a gunshot through her ankle. (*See id.*)

Finally, when ATF interviewed Ms. Palacios again at her home, she "simply said that she remembers waking up, she remembers getting shot, and she remembers nothing else." (*See id.*) Before the grand jury, Ms. Palacios testified that she suffers from post-traumatic stress disorder and doesn't remember anything about the shooting. (*See id.* at 3.) Ms. Palacios also made several statements about herself to ATF investigators during these interviews, including "that she 'has to protect herself . . . .'" (*Id.* at 2.) In response to the agents stating that they were gathering incriminating evidence about Defendant from various other sources, she stated, "Well, then use them and have them get shot, not me." (*See id.* (internal quotation marks omitted).)

The Government theorizes that Defendant and Ms. Palacios argued[3] and Defendant shot his girlfriend. The Government also believes that Defendant disposed of the gun after the incident. (*See* Doc. 47 at 1–2.) It does not have the gun in evidence. Defendant theorizes that the gun accidentally discharged when Ms. Palacios dropped it. (*See* Doc. 37 at 1.)

**B.  Count 2**

In May 2016, Defendant was on state probation following a 2013 felony conviction in Doña Ana County, New Mexico. (Docs. 45 at 2–3; 47 at 3.) Per the terms of his probation, Defendant "had a regularly scheduled meeting with his probation officer on May 11." (Doc. 47 at 3.) "On or about May 9, while still staying with [Teresa Palacios's] mother," Defendant asked a neighbor, Mr. Francisco Lopez, to hold two pistols for him "because [he] was going away for a while and did not want police to find them." (*Id.*) Mr. Lopez, who is a gun owner and is familiar with guns, agreed to store the pistols—a .22 caliber and a .40 caliber. (*Id.* at 3–4.) Mr. Lopez will testify that "[h]e remembers their exact calibers because he recalls seeing the caliber numbers etched into the pistols" as if "etched by a machine." (*Id.* at 4.) Mr. Lopez "described the pistols as 'normal' guns that appeared to have been made in a factory and sold in a store. Further, Mr. Lopez knew that the pistols were loaded when Defendant handed them over because Mr. Lopez removed the magazines and cleared the pistols." (*Id.*) Mr. Lopez's partner also occasionally saw the pistols. (*Id.*) "About three months later, following Defendant's incarceration for a state probation violation, Defendant returned home and asked Mr. Lopez for the pistols." (*Id.*) Mr. Lopez returned the guns, and his partner saw the exchange. (*Id.*)

---

[3] Ms. Doe's mother stated that "[a]round 2:00 a.m. the morning of May 6, 2016, [she] heard [the couple] fighting loudly in their bedroom." (Doc. 49 at 3.) She left for work around 6:00 a.m. that morning, and Ms. Doe was injured sometime between 6:00 and 7:30 a.m. (*Id.*)

## II. Legal Standards

### A. Rule 702

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–97 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999). Rule 702 instructs courts "to admit specialized knowledge if it will assist the trier of fact in understanding the evidence[, and] . . . dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject." *United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991).

"The proponent of the evidence has the burden of showing that expert evidence is admissible, by a preponderance of proof." *United States v. McCluskey*, 954 F. Supp. 2d 1224, 1237 (D.N.M. 2013) (citing *Daubert*, 509 U.S. at 592 n.10; *United States v. Orr*, 692 F.3d 1079, 1091 (10th Cir. 2012); Fed. R. Evid. 702 advisory committee's note to 2000 amendment). "The trial court has 'wide latitude' in exercising its discretion to admit or exclude expert testimony." *Id.* (quoting *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004); citing *Kumho*, 526 U.S. at 147 (finding the trial court has "'broad latitude' in determining how to determine reliability and in ultimate reliability determination")).

> In *Daubert*, the Supreme Court set out a non-exhaustive set of factors that trial courts may consider in determining whether proposed expert testimony is based on reliable methods and principles: (1) whether the particular theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community.

*United States v. Taylor*, 663 F. Supp. 2d 1170, 1173 (D.N.M. 2009) (citing *Daubert*, 509 U.S. at 593–94). The Rule 702 inquiry is "flexible." *See Daubert*, 509 U.S. at 594.

"The Federal Rules encourage the admission of expert testimony[,]" and there is a presumption under the Rules "'that expert testimony is admissible.'" *McCluskey*, 954 F. Supp. 2d at 1238 (quoting 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.02[1], at 702-5 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2012)). Rather than excluding expert testimony, the Supreme Court encourages "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" to attack "shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

### B. Rule 703

Federal Rule of Evidence 703 provides that:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. "[W]hen an expert reasonably relies on inadmissible information to form an opinion or inference," the court must "conduct a balancing test" to determine whether the expert may share such information with the jury. *Szymanski v. Murphy*, 437 F. App'x 649, 654 (10th Cir. 2011); Fed. R. Evid. 703.

6

## C. Rule 403

"Relevant evidence is generally admissible." *United States v. Cerno*, 529 F.3d 926, 933 (10th Cir. 2008) (citing Fed. R. Evid. 402). "Under Rule 403, however, a district court may exclude relevant evidence if its probative value 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . .'" *Id.* (quoting Fed. R. Evid. 403). "Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice." *United States v. Ballou*, 59 F. Supp. 3d 1038, 1049 (D.N.M. 2014) (citing *United States v. Record*, 873 F.2d 1363, 1375 (10th Cir. 1989)). "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." *Id.* (quoting *United States v. Pettigrew*, 468 F.3d 626, 638 (10th Cir. 2006) (internal quotations omitted, alteration in original)). District courts "should be 'mindful' that 'exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly.'" *Id.* (quoting *United States v. Smalls*, 605 F.3d 765, 787 (10th Cir. 2010) (internal quotations omitted)).

## D. Fifth and Sixth Amendments

"A criminal defendant's right to present a defense is essential to a fair trial." *United States v. Serrano*, 406 F.3d 1208, 1214–15 (10th Cir. 2005) (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 875 (1982) (O'Connor, J., concurring)). "The Fifth . . . and Sixth Amendments concomitantly provide a criminal defendant the right to present a defense by compelling the attendance, and presenting the testimony, of his own witnesses." *Id.* (citing *Washington v. Texas*, 388 U.S. 14, 18–19 (1967)). "The Supreme Court's broad reading of the Sixth Amendment's Compulsory Process Clause," *id.* (citing *Taylor v. Illinois*, 484 U.S. 400, 407–408 (1988)), "'establish[es], at a minimum, that criminal defendants have the right to the

government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt.'" *Id.* (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)). "Likewise, '[t]he necessary ingredients of the [Fifth Amendment's] . . . guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony.'" *Id.* (quoting *Rock v. Arkansas*, 483 U.S. 44, 51 (1987) (brackets omitted)).

### III. Discussion

The Court finds that a *Daubert* hearing is not necessary at this time. *See United States v. Charley*, 189 F.3d 1251, 1266 (10th Cir. 1999) (noting that "[t]he trial judge is granted great latitude in deciding . . . whether to hold a formal hearing") (citation omitted); *United States v. Ellis*, 193 F. App'x 773, 777 (10th Cir. 2006) (stating that the "district court has latitude in determining the procedures used to perform its gatekeeping function" and "may do so without holding a *Daubert* hearing") (citations omitted). Although a *Daubert* hearing is the most common method to satisfy the court's gatekeeping function, the "process is not specifically mandated." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (citations omitted). Provided that "the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand[,]'" it may fulfill its role after a *Daubert* hearing or "when asked to rule on a motion in limine, on an objection during trial, or on a post-trial motion . . . ." *Id.* (quoting *Daubert*, 509 U.S. at 597). Therefore, the Court will address Defendant's objections to the experts herein, and if necessary will exercise its discretion to consider any remaining or unanticipated issues that may arise at trial with regard to their testimony.

### A. Defendant does not dispute that both experts are ordinarily qualified to offer opinions on firearms.

On July 31, 2018, the Government filed a notice of intent to introduce at trial the expert testimony of Mr. Lester Roane and Special Agent (SA) Dennis King. (*See* Doc. 30.) Defendant moves to exclude the testimony of Mr. Roane and SA King pursuant to *Daubert*, Federal Rules of Evidence 403, 702, and 703, and the Fifth and Sixth Amendments to the Constitution. (Docs. 37 at 1; 38 at 1.)

#### 1. Mr. Roane

The United States anticipates that Mr. Roane will testify regarding: (1) "the various design features that firearm manufacturers implement to prevent handguns from accidentally discharging when dropped"; (2) "the regulations regarding drop tests with which firearm manufacturers must comply before selling a particular model of handgun"; (3) the fact "that he has conducted more than 100 handgun drop tests of various models from many major firearm manufacturers"; and (4) his opinion "that it is extremely rare for any commercially manufactured firearm produced after the 1970s to discharge accidentally when dropped." (Doc. 30 at 2.)

Defendant does not argue that Mr. Roane is unqualified "to analyze and test firearms[,]" nor that the methods he has used to test firearms in the past are unreliable. (*See* Doc. 62 at 3 (noting that "Mr. Roane is qualified to analyze and test firearms").)

#### 2. SA King

The United States anticipates that SA King will testify that: (1) "there are no firearms commercially manufactured in . . . New Mexico, so, to the extent that Defendant possessed commercially manufactured firearms within New Mexico, they must have traveled in interstate commerce"; and (2) "the ammunition . . . was manufactured in either Minnesota or Idaho, so it must have traveled in interstate commerce to arrive in New Mexico." (Doc. 30 at 1.)

Defendant does not argue that SA King is unqualified to render an opinion about whether firearms and ammunition have moved in interstate commerce in general, or that his methods are generally unreliable. In fact, Defendant does not object to SA King's testimony as it relates to Count 3—the ammunition count.

### B. The Court will deny Defendant's motions and allow the experts to testify.

#### 1. The experts' testimony is proper under Rule 702.

Defendant objects to both experts on similar grounds. First, Defendant objects to the testimony pursuant to Rule 702 on the basis that (1) the United States has not shown that either expert "is qualified to render an opinion about" the firearms at issue because they have not seen the firearms charged in Counts 1 and 2; (2) any proposed testimony is unreliable because it is based on speculation; and (3) the testimony "is not sufficiently tied to the facts of the case" and will not be helpful to the jury. (Docs. 37 at 4–6; 38 at 4–6.) Defendant also argues, with respect to Mr. Roane, that the practical effect of the testimony will be to imply that Ms. Palacios was lying about the source of her gunshot wound and it is, therefore, improper. (Doc. 37 at 6.) The Court turns first to the argument unique to Mr. Roane.

<u>The United States seeks to introduce Mr. Roane's testimony for a proper purpose.</u>

It is important to note why the United States seeks to introduce Mr. Roane's testimony. Defendant argues that the United States intends to use Mr. Roane's opinion to discredit Ms. Palacios, which would be improper under Tenth Circuit authority. (Doc. 37 at 6 (discussing *United States v. Toledo*, 985 F.2d 1462, 1470 (10th Cir. 1993) ("The credibility of witnesses is generally not an appropriate subject for expert testimony.") (internal citation omitted)).) The United States avers that it does not seek to use expert testimony to establish that Ms. Palacios is lying, particularly because she "testified before the grand jury that she does not remember any of

the events on May 6, 2016." (Doc. 47 at 8.) Instead, the United States seeks to bolster its theory that "*Defendant* was lying when he told ATF agents that the firearm discharged accidentally when dropped." (Doc. 47 at 8.) The government theorizes that Defendant shot Ms. Palacios; therefore, he was necessarily a felon in possession of a firearm as charged in Count 1. (*Id.* at 13–15.) To prove its theory, the United States seeks to establish, through Mr. Roane's testimony, that it is highly unlikely Ms. Palacios dropped the gun and it accidentally discharged.

It is true that "expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702." *United States v. Hill*, 749 F.3d 1250, 1259 (10th Cir. 2014) (quoting *Charley*, 189 F.3d at 1267 (internal citations omitted)). "These rationales apply with equal force in the context of opinion testimony that attacks credibility." *Id.* at 1261. But here, Mr. Roane is not directly testifying about Ms. Palacios's credibility. He will testify about whether firearms manufactured after the 1970s are likely to accidentally discharge when dropped. (*See* Doc. 30 at 2.) That the jury may make certain inferences based on Mr. Roane's opinion does not require the Court to exclude his testimony. The Court will, however, grant Defendant's motion to the extent that Mr. Roane may not directly testify about Ms. Palacios's—or any witness's—veracity.

<u>Defendant's remaining arguments under Rule 702 are unpersuasive.</u>

Defendant's remaining three arguments are related: he argues that because the experts are not qualified to testify about *missing* firearms, their proposed opinions will be based on speculation and will be unreliable. (Docs. 37 at 6; 38 at 4–5.) Consequently, Defendant contends, their testimony will not be helpful to the jury. Under Rule 702, the Court must first determine whether an expert's specialized knowledge will help the jury "understand the evidence or . . .

11

determine a fact in issue." Fed. R. Evid. 702(a). Defendant argues that the experts' testimony will not be helpful, because the opinions will be speculative and unreliable. (Docs. 37 at 6; 38 at 4–5.) He also avers that there is evidence that "modern firearms can and do discharge when dropped[,]" thus, the information is within jurors' common knowledge and expert testimony is unnecessary. (Doc. 62 at 4 (citing Trigger Warning, https://www.cnn.com/interactive/2018/06/investigates/sig-sauer-p320-drop-fire/); *see also* Doc. 37 at 3.) The Court disagrees that modern safety standards and the drop-testing of firearms are within jurors' common knowledge and experience. Moreover, the Court finds that the experts' opinions will help establish facts in issue. Mr. Roane's testimony will help the jury determine who possessed the firearm in Count 1. SA King's testimony will help the jury determine whether any of the three firearms have passed through interstate commerce.

To argue that Mr. Roane's opinion is unreliable, Defendant cites to *United States v. Fisher*, No. CR 01-769 L, 2002 WL 31571549 (E.D. Pa. Nov. 19, 2000). In *Fisher*, the defendant sought to introduce testimony from an expert who would opine on whether the condition of a firearm, which the government had recovered, was "consistent with having been thrown onto a hard paved surface." 2002 WL 31571549, at *1. The expert had previously performed drop tests to determine "whether a particular firearm would accidently discharge when dropped," but he had not performed sufficient tests relevant to the issues in that case—"whether the firearm in question had been dropped or thrown onto a paved surface while the Defendant was allegedly running from police[,]" and "what marks were left on the firearm as a result of being dropped." *Id.* at *7. The court found that the expert had simply "not done sufficient testing to provide a

reliable opinion [on] the numerous different factors" at play with that particular firearm.[4] *Id.* at *8.

As the Government asserts, however, Mr. Roane will not opine about the particular firearm that injured Ms. Palacios—he will simply testify to "a class of firearms generally. Namely, he will opine that it is extremely rare for any firearm commercially manufactured in the last five decades to discharge accidentally when dropped." (Doc. 47 at 8.) Thus, *Fisher* is inapposite.

> Defendant correctly states:
>
> Reliability requires ["](i) a showing that the method or principle used by the witness is reliable; (ii) a showing that the witness used sufficient facts and data as required by the method or principle; and (iii) a showing that the witness properly applied the method or principle to the collected facts and data.["]

(Doc. 37 at 4 (quoting *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008)).) Defendant attacks the second element and asserts that the experts do not have sufficient facts and data because they have not examined the firearms at issue. (*See id.* at 4–5; 38 at 4–5.) The opinions, Defendant contends, will be based on "pure speculation." (Docs. 37 at 5; 38 at 5.) The United States argues that, rather than basing their opinions on speculation, the experts will be aided by the statements of both Defendant and Mr. Lopez, who described the firearms in Counts 1 and 2.

Relevant to Count 1, Defendant described the firearm that injured Ms. Palacios "as a black and gray 9 millimeter semiautomatic pistol" in his interview with DASO Dow at the hospital on May 6, 2016. (Doc. 47 at 2.) Defendant's neighbor, Mr. Lopez, who owns guns himself, will testify "that the pistols charged in Count 2 were a .22 caliber and a .40 caliber." (*Id.*

---

[4] The Court took particular issue with the fact that the expert had "made no attempt to duplicate the exact conditions present at the time of the incident in question . . . ." *Fisher*, 2002 WL 31571549, at *8.

at 9.) He will state "that the pistols had etchings on them as if they were made with a machine, and he [will testify] that the pistols looked like the kind that would have been made in a factory and sold in a store." (*Id.*)

Defendant argues that his "vague description" of the pistol in Count 1 is too general and "insufficient to form the basis of a reliable opinion" (Doc. 62 at 2), and there is no way to be sure that the firearm "was endowed with a functional safety system" (Doc. 37 at 5–6 ("expert's testimony must be 'based on actual knowledge, not "subjective belief or unsupported speculation"'") (citing *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 590))). Defendant further contends that there is no way to know when and where any of the three firearms were manufactured; they could have been 3-D printed or made prior to the 1970s. (*See* Docs. 37 at 5–6; 38 at 5.) Consequently, he argues, the experts will have to base their opinions on "unsubstantiated assumption[s]."[5] (Docs. 37 at 5; 38 at 5.)

The Tenth Circuit has, however, allowed experts to testify about a firearm that was not recovered or admitted into evidence and was identified only by witness testimony. In *United States v. Overstreet*, 40 F.3d 1090 (10th Cir. 1994), the defendant "appeal[ed] his convictions for armed carjacking . . . , using a firearm while committing a crime of violence . . . , and possessing a firearm after having been convicted of a felony . . . ." 40 F.3d at 1092. As part of the carjacking, the defendant pointed a silver revolver at his victim's "face and cocked it. [The victim] testified that he could see bullets in the chamber . . . ." *Id.* The Government never recovered the revolver. *Id.* at 1095. The trial court admitted the testimony of an ATF agent based on the victim's description of the gun. *Id.* The ATF agent, who had not examined the revolver in

---

[5] Defendant also argues that "it would be rank speculation for . . . Mr. Roane to testify[ ] that the alleged firearm did not accidentally discharge when it was dropped." (Doc. 37 at 5.) But that is not what Mr. Roane will opine—he will simply "testify that it is extremely rare for *any* firearms commercially manufactured after the 1970s to discharge accidentally when dropped." (Doc. 47 at 6 (emphasis added).)

14

question nor "any particular firearm in connection with [the] case[,]" opined that: (1) in general, "there are not, and have never been, any manufacturers of revolvers in" the state, and (2) any revolver the defendant used during the crime in the state "necessarily travelled in interstate commerce." *Id.*

The defendant "argue[d] that the gun in question was not sufficiently identified to provide foundation for" the agent's testimony. *Id.* He relied on *United States v. Gregg*, 803 F.2d 568, 571 (10th Cir. 1986), where the firearm "was allowed only after a detailed description . . . was provided by witnesses to the crime." *Id.* In *Overstreet*, the victim merely "testified that the defendant was holding a silver, large caliber revolver which looked like the gun used in the courtroom demonstration of the carjacking." *Id.* The Tenth Circuit was unpersuaded by the defendant's argument and found that the victim's testimony "provided sufficient foundation for" the agent to opine "that no revolvers are manufactured in Oklahoma and, thus, the gun must have travelled in interstate commerce." *Id.*; *accord United States v. Maxwell*, No. 94-5355, 1995 WL 391982, at *5–6, 60 F.3d 826 (4th Cir. July 5, 1995) (rejecting defendant's challenge to whether the government established the interstate nexus element under § 922(g)(1) where there was eyewitness testimony that defendant held an Uzi (an Israeli-made machine gun) during a robbery).

Defendant argues that *Overstreet* is distinguishable because the description of the gun in that case was more detailed than the descriptions that Mr. Lopez and Defendant have provided about the guns charged here. (Doc. 62 at 2.) The Court disagrees. The only difference between the description in *Overstreet* ("silver, large caliber revolver") and the description Defendant gave DASO Dow relevant to Count 1 ("black and gray 9 millimeter semiautomatic pistol"), is the type and color of firearm identified. Mr. Lopez's description (.22 and .40 caliber pistols with

15

machine-made etchings) of the two firearms charged in Count 2 is similarly sufficient.[6] And while the two descriptions are admittedly general, the Government emphasizes what each description lacks: neither man described the guns as 3-D printed, homemade, or antique, which Defendant argues that the firearms *could have* been. (*Id.* at 9; Doc. 38 at 5.)

The Government also cites to *United States v. Thompson*, 47 F. Supp. 2d 658 (D.S.C. 1999), where "a jury convicted [the] defendant on three counts of being a felon in possession of a firearm . . . and one count of possession of a 'sawed-off' shotgun.'" 47 F. Supp. 2d at 658. The defendant moved for acquittal on one of the felon in possession counts and argued that because the United States had not recovered the firearm at issue, it was unable to prove that the firearm had travelled in interstate or foreign commerce. *Id.* at 660. The court noted that while it was undisputed that the firearm was a .38 caliber revolver, the United States did not produce an eyewitness who specifically identified the gun. *Id.* Based only on the fact that the firearm was a .38 caliber revolver, the United States' expert, an ATF agent, "opined that it [was] 'highly unlikely'" the firearm was manufactured in the state.[7] *Id.* The court examined cases where the government was unable to produce a firearm but offered expert testimony on the interstate nexus element. *See id.* at 661–63 (gathering cases). The court concluded that "proof beyond a

---

[6] The *Overstreet* witness also had the opportunity to see a similar firearm during a courtroom demonstration. 40 F.3d at 1095 (noting that the witness "testified that the defendant was holding a silver, large caliber revolver which looked like the gun used in the courtroom demonstration of the carjacking"). It is unclear whether the expert also saw the revolver in the courtroom demonstration or knew that the witness had seen that revolver. Regardless, Defendant does not mention this distinction.

[7] The agent in *Thompson* relied on the following facts to support his opinion:
> (1) during his service as a law enforcement officer, he had never seen a revolver that had been manufactured in South Carolina; (2) he consulted with another firearms expert who told him that in 24 years as a firearms expert, he had never heard of a revolver being manufactured in South Carolina; (3) he researched the reports of licensed firearms manufacturers between 1988 and 1997 (the year prior to defendant's possession) and found that of the approximately four million revolvers that were manufactured, none was made in South Carolina; and (4) no licensed firearm manufacturer operating in South Carolina between 1988 and 1997 reported manufacturing revolvers.

*Thompson*, 47 F. Supp. 2d at 660–61.

reasonable doubt does not require proof beyond all doubt. Unquestionably, [the agent's] testimony leaves open some possibility that the" firearm was manufactured in that state. *Id.* at 663. Based on the agent's testimony that it was "highly unlikely" that the firearm was manufactured in the state, and viewed in the government's favor, the jury was able to make a determination on the interstate nexus element beyond a reasonable doubt. *Id.*

The government contends that:

> [SA King's] colleagues have conducted research by contacting every entity with a federal firearm manufacturing license in the State of New Mexico, and none of those licensees actually manufacture firearms. Many of them order pre-fabricated parts from out of state that meet the federal definition of "firearm" and assemble them to create items for sale. None of them actually manufacture any firearms in state (with the exception of one company that manufactured a limited number of shotguns in the past).

(Doc. 47 at 5.) The United States has filed a supplement to its research. (*See* Doc. 73.) Assuming that the United States is able to establish at trial that the data SA King will rely on to form his opinion—that is, that New Mexico firearms manufacturers do not and have not manufactured firearms as described, the Court finds that SA King may reliably opine on whether firearms of the type charged in Counts 1 and 2 have likely travelled in interstate commerce.

The Court concludes that, based on Defendant's and Mr. Lopez's descriptions of the firearms, SA King has adequate information to form an opinion on the types of firearms described in Counts 1 and 2 and whether the three firearms likely moved in interstate commerce. And based on Defendant's description, Mr. Roane has adequate information to form an opinion on whether firearms of that type, made after the 1970s, are likely to accidentally discharge when dropped. Mr. Roane may not testify about the veracity of any witness, and he may not opine on whether the specific firearm charged in Count 1 was likely to have accidentally discharged if dropped. Defendant is free to analyze flaws in the experts' opinions on cross-examination.

17

### 2. The experts' testimony is proper under Rule 703.

Defendant does not develop an argument under Rule 703, which "deals with the issue of disclosing inadmissible matters to the jury." *Szymanski*, 437 F. App'x at 654. To the extent that he bases it on the fact that the experts did not "personally observe" the firearm in question, that would not provide a basis for exclusion of their testimony under Rule 703. The Rule specifically contemplates that "[a]n expert may base an opinion on facts or data in the case that the expert **has been made aware of *or* personally observed**.'" Fed. R. Evid. 703 (emphasis added); *see also United States v. Chapman*, 839 F.3d 1232, 1238 (10th Cir. 2016) (rejecting defendant's argument that an expert's "testimony was not reliable because she never met [a sexual abuse victim], nor did [the expert] ever examine or evaluate her"). "Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Chapman*, 839 F.3d at 1238 (quoting *Daubert*, 509 U.S. at 592 (citing Fed. R. Evid. 701–03)); citing *United States v. Lauder*, 409 F.3d 1254, 1264 & n.5 (10th Cir. 2005) ("Daubert generally does not . . . regulate the underlying facts or data that an expert relies on when forming her opinion.")). Mr. Roane and SA King may testify based on information they have been made aware of: the descriptions of the firearms. Moreover, Defendant has not specified any inadmissible facts or data that he objects to under Rule 703.

### 3. The experts' testimony is appropriate under Rule 403 and the Fifth and Sixth Amendments.

With respect to Count 1, Defendant argues that because the government will offer Mr. Roane's testimony "to persuade the jury that the alleged victim's testimony is not true[,]" the danger of unfair prejudice outweighs any probative value. (Doc. 37 at 7.) Defendant also submits that "whether or not the alleged firearm was drop safe is not relevant to the charge in this case." (Doc. 62 at 4.) Again, the Government does not intend to use Mr. Roane's testimony to call Ms.

Palacios's testimony into question, but to support its theory that Defendant shot Ms. Palacios. (*See* Doc. 47 at 8.) Thus, the issue of drop safety is relevant.

Defendant also contends that "the government wants to use Mr. Roane's eminent experience to bridge a gap in its case." (Doc. 62 at 3.) This seems to be the more likely cause of unfair prejudice: as the Government builds its case to show that Defendant shot his girlfriend, there is a danger that the jury may use certain information as propensity evidence. Defendant may, however, submit proposed limiting instructions when appropriate. Ultimately, the Court finds that the probative value of the experts' opinions outweighs any danger of unfair prejudice.

Defendant argues that if the experts are "permitted to testify about speculative opinions divorced from the facts, [Defendant] would be unable to meaningfully cross-examine [them] and present a defense" pursuant to the Fifth and Sixth Amendments. (Docs. 37 at 7; 38 at 6.) Yet, allowing the experts to testify will not prevent Defendant "from presenting critical evidence[,]" nor will it deny "him a trial in accord with traditional and fundamental standards of due process." *Tally v. Ortiz*, 252 F. App'x 248, 257 (10th Cir. 2007) (discussing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). As stated above, Defendant may vigorously cross-examine the experts on the fact that they did not examine the firearms in question and may also argue to the jury that the expert testimony is not reliable.

In sum, the United States has demonstrated that both experts are qualified to render opinions in this matter. The Court finds that the experts' testimony, based on the descriptions of the firearms and on the United States' forthcoming research regarding New Mexico firearms manufacturers, will be sufficiently reliable and relevant and will assist the jury in resolving facts in dispute. The United States admits that the experts' "opinions . . . leave open some possibility that the charged pistols do not fall within the scope of those opinions." (Doc. 47 at 11.)

Defendant is free to point out the gaps in the experts' testimony on cross-examination, and the jury may decide how much weight to give the opinions. *See McCluskey*, 954 F. Supp. 2d at 1254, 1255 (noting that *Daubert*'s direction to attack "shaky but admissible evidence" by "[v]igorous cross-examination . . . strongly suggests that the jury is to decide many issues of reliability"). And, as described herein, Mr. Roane may not opine about the specific firearm charged in Count 1, and neither expert may opine on another witness's credibility.

The Court will deny Defendant's motions. The United States is directed to supplement its research on firearms manufacturers in New Mexico as referenced in its response brief no later than October 15, 2018. It shall also provide Defendant with "any statements, including grand jury testimony, of *Daubert* hearing witnesses" no later than October 15, 2018. (*See* Docs. 37 at 8; 38 at 7.)

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE