# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        Plaintiff,

**v.**                              No. 18-cr-1243 RB

**ROBERTO TREJO,**

        Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

This matter is before the Court on Defendant Mr. Roberto Trejo's Motion to Suppress Statements (Doc. 39), filed August 17, 2018. The Court held a hearing on this motion on September 25, 2018. Defendant argues that his waiver of *Miranda* rights during an interview with ATF agents was not valid, and that his statements were subtly coerced. The Government contends that Defendant's waiver was completely knowing and voluntary, and that the interview involved no threats or coercion of any kind. Having considered the submissions of counsel, the record, relevant law, and being otherwise fully advised, the Court issues these findings of fact and conclusions of law and will **deny** this motion.

## FINDINGS OF FACT

Federal Rule of Criminal Procedure 12(d) provides that "when factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d). At the hearing held on September 25, 2018, the Court heard testimony from ATF Special Agent Boyd Sterling Nixon. Based on the hearing and the record, the Court makes the following findings of fact:

1. Defendant is charged in Counts 1 and 2 of the Superseding Indictment with being a felon in possession of a firearm, and in Count 3 with being a felon in possession of ammunition, all in violation of 18 U.S.C. § 922(g)(1).

2. Count 1 stems from a May 6, 2016 incident in which Defendant's girlfriend, Ms. Teresa Palacios, was shot through the back of the ankle at her home in Las Cruces, New Mexico.

3. The Government has not recovered the firearm charged in Count 1.

4. On the morning of May 11, 2016, ATF Special Agent Sterling Nixon and Task Force Officer Charles Wright interviewed Defendant at Ms. Palacios's home, where Defendant was living at the time with Ms. Palacios and her mother.

5. When Agent Nixon arrived at the home, Defendant was already there with two probation officers and Officer Wright. Defendant had been at the Adult Probation and Parole Office prior to the interview, and Probation and Parole officers had transported him home in handcuffs. Probation and Parole officers removed his handcuffs before the interview.

6. Agent Nixon and Officer Wright were in plain clothes, identified themselves as law enforcement agents, and carried concealed weapons.

7. Agent Nixon read Defendant each of his *Miranda* rights, and Defendant orally confirmed that he understood each right and would continue with the interview because he had "nothing to hide." (Gov't Ex. 1a at 01:25.)[1] He indicated that he had been advised of his *Miranda* rights before. Defendant then signed an Advice of Rights and Waiver form. (Gov't Ex. 2.)

8. Agent Nixon asked, "So, you know why we're here, right?" Defendant replied, "Cause of the gun. You guys want the gun." (Gov't Ex. 1a at 03:10.)

---

[1] Unless otherwise identified, all exhibits referenced in this Order are exhibits introduced by the parties regarding the Motion to Suppress Statements (Doc. 39) during the September 25, 2018 Motions Hearing.

9. A few minutes into the interview, Agent Nixon paused to advise Defendant of 18 U.S.C. § 1001 and the dangers of perjury. Defendant asked "What does that mean?" (*Id.* at 03:55.) Agent Nixon explained that he could be charged with a federal crime for making false statements, and Defendant indicated that he understood. Defendant then signed a form signifying he had been made fully aware of section 1001 and understood its implications. (Gov't Ex. 3.)

10. During the roughly 40-minute interview, Mr. Trejo made statements concerning the shooting of Ms. Palacios and the gun that injured her.

11. Throughout the interview, Agent Nixon asked Defendant various questions about the gun that caused the shooting, Defendant's familiarity with guns generally, and whether Defendant touched the gun after Ms. Palacios was shot. He also asked questions about Ms. Palacios and her family members, and whether other people lived in and had access to the home.

12. Following several questions from Agent Nixon about firearms, Defendant mentioned that he "can't be around guns" because he is a felon. (Gov't Ex. 1a at 36:55.)

13. Agent Nixon stated, in regard to Ms. Palacios, "She knew she had a gun in the house . . . this is on her. It has nothing to do with you." (*Id.* at 38:00.)

## CONCLUSIONS OF LAW

### I. Background

Defendant seeks to suppress statements made during the interview because he did not "knowingly and intelligently waive[] his privilege against self-incrimination and the statements were [not] voluntary." (*See* Doc. 39 at 2.) Defendant argues that the ATF agents established trust with Defendant by convincing him they wanted to talk only about Ms. Palacios's role in the shooting, then elicited potentially incriminating statements about possessing a firearm. (*See id.* at

4–6.) He argues that the agents never made sure he understood his right to remain silent and right to counsel in regard to questioning related to firearm possession. (*See id.*) Defendant argues that by asking him if "he was involved in the [shooting] incident," the agents were concealing the true objective of their inquiry and "minimiz[ing] the consequences of the waiver." (Doc. 60 at 2–3.) He argues the agents used "subtle coercive tactics," rendering the statements involuntary. (*Id.* at 4.) The Government responds that Defendant was fully informed of his rights and that he "clearly, unequivocally, knowingly, intelligently, and voluntarily waived those rights verbally and in writing." (*See* Doc. 48 at 1.) The Government also argues that Defendant was not coerced into making statements about the shooting incident and the gun. (*See id.*)

## II.   Legal Standard

A valid waiver of *Miranda* rights "must be made 'voluntarily, knowingly, and intelligently.'" *Smith v. Mullin*, 379 F.3d 919, 932 (10th Cir. 2004) (quoting *Miranda v. Arizona,* 384 U.S. 436, 444 (1966)). The "inquiry into a waiver's validity has two dimensions." *United States v. Smith*, 606 F.3d 1270, 1276 (10th Cir. 2010). First, "the relinquishment of the right must have been . . . the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Though the government bears the burden of showing that the waiver was voluntary, it "need prove waiver only by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

"Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *United States v. Smith*, 606 F.3d at 1276; s*ee also United*

*States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002). The Tenth Circuit has identified a number of factors courts may consider in determining whether a waiver was truly voluntary: "the suspect's age, intelligence, and education; whether the suspect was informed of his or her rights; the length and nature of the suspect's detention and interrogation; and the use or threat of physical force against the suspect." *United States v. Smith*, 606 F.3d at 1276 (citing *Mullin*, 379 F.3d at 934; *United States v. Minjares-Alvarez*, 264 F.3d 980, 985 (10th Cir. 2001)).

Similarly, the determination of whether an incriminating statement or confession was voluntary should also be made after considering the totality of the circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The Tenth Circuit has held that relevant factors in this analysis include, much like the test for *Miranda* waivers: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." *United States v. Lopez*, 437 F.3d 1059, 1063–64 (10th Cir. 2006) (quoting *United States v. Toles*, 297 F.3d 959, 965–66 (10th Cir. 2002)).

### III. Analysis

**A. Defendant's waiver of his *Miranda* rights was valid.**

Here, the totality of the circumstances surrounding the ATF interview and Defendant's waiver of his *Miranda* rights suggests that the waiver was fully voluntary and Defendant understood his choice to waive his rights and continue the interview. Both parties agree that the situation could be considered "custodial" such that Defendant's rights attached under *Miranda v. Arizona*. (*See* Docs. 48 at 3, n.1; 60 at 2); 384 U.S. at 439. Though Defendant's age and level of education were not discussed during the interview or at the hearing, throughout his conversation

with ATF agents he was coherent, articulate, responsive, and indicated that he was familiar with the criminal justice system and had been advised of his *Miranda* rights before. Agent Nixon read Defendant each of his rights and obtained his verbal consent that he understood each one. Defendant then affirmatively indicated that he was willing to go forward with the interview because he had "nothing to hide." (Gov't Ex. 1a at 01:25.)

Defendant was clearly capable of asking for clarification of rights or issues he didn't understand, as evidenced in the exchange in which Agent Nixon warned him about perjury and Defendant asked him to explain further. The interview lasted only 40 minutes and took place in Defendant's home. The agents were dressed in plain clothes, Defendant was not in handcuffs during the questioning, and the tone of the interview was generally cordial and professional. The agents never used nor threatened to use force against Defendant during the interview. Under the factors the Tenth Circuit has endorsed for determining whether a waiver of *Miranda* rights was voluntary, nothing suggests that Defendant's waiver was not voluntary here.

Defendant cites several cases to assert, correctly, that "[a]ffirmative misrepresentation by the police can render waivers involuntary." (Doc. 60 at 2 (collecting cases).) Even Defendant's own descriptions of these cases, however, suggest that there was no affirmative misrepresentation here. (*See id.* (citing examples including officers misrepresenting that "a suspect would be deprived of state financial aid for her dependent child if she failed to cooperate," and "suspect's friend would lose his job as a police officer if the suspect failed to cooperate," as well as an officer contradicting a prior *Miranda* warning by stating that "honesty wouldn't hurt").) It is true that Agent Nixon never explicitly told Defendant he was being interviewed in regard to a potential felon in possession charge. But, Defendant knew from the outset that the interview was about the shooting incident and the gun, and that agents sought to

find out exactly what happened on May 6, 2016, and Defendant's role in the incident. (*See* Gov't Ex. 1a at 03:10 ("So, you know why we're here, right?" . . . "Cause of the gun. You guys want the gun.").)

Throughout the interview, Agent Nixon asked Defendant various questions about the gun that caused the shooting, how he had become so familiar with guns, whether he touched the gun after Ms. Palacios was shot, etc. At one point, Defendant even mentioned the fact that he knows he "can't be around guns" because he is a felon. (*Id.* at 36:55.) In the final minute of the interview, Agent Nixon did briefly insinuate that the agents were trying to find out only whether Ms. Palacios knew there was a gun in the house and why she was afraid of going to the hospital. (*See id.* at 38:00 ("This is on her. This has nothing to do with you.").) Still, this line of questioning also included prior questions about whether Defendant knew there was a gun in the house, and does not amount to an affirmative misrepresentation about the interview. This is particularly true given that Agent Nixon made the statement in the final moments of the 40-minute interview. Defendant knew the agents were interviewing him to find out more about the shooting incident, the gun involved, and who it belonged to, and he knew he was not allowed to possess firearms as a convicted felon. Still, he voluntarily waived his *Miranda* rights and continued to answer Agent Nixon's questions about the incident.

### B. Defendant's statements during the interview were not coerced.

Similarly, the fact that the agents did not explicitly discuss the felon in possession charge during the interview does not mean that Defendant's statements were coerced. *See United States v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002) ("a defendant's confession is not coerced merely because law enforcement did not inform the defendant of all the potential charges that could be brought"). Defendant was fully advised of his rights, the interrogation was fairly brief, Defendant

answered questions coherently and intelligently, and the agents were calm and certainly did not subject him to physical punishment. *See also Lopez*, 437 F.3d at 1063–64. Under both totality of the circumstances tests, Defendant's waiver of *Miranda* rights and his statements about the shooting were fully voluntary.

**THEREFORE**,

**IT IS ORDERED** that Defendant Roberto Trejo's Motion to Suppress Statements (Doc. 39) is **DENIED.**

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**